APPROVED: _/s/ Mathew Andrews_
Mathew Andrews
Assistant United States Attorney

BEFORE: THE HONORABLE PAUL E. DAVISON
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **SEALED COMPLAINT** |
| - v. - | : | Violations of 18 U.S.C. §§ 371, 1960, and 2 |
| CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, | : | COUNTIES OF OFFENSE: ORANGE, ROCKLAND |
| Defendants. | : | 19m10886 |

- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

MEREDITH McGOVERN, being duly sworn, deposes and says that she is a Task Force Officer with the Federal Bureau of Investigation ("FBI"), and charges as follows:

## COUNT ONE
### (Conspiracy to Operate an Unlicensed Money Transmitting Business)

1. From at least in or about September 2014, up to and including at least in or about August 2016, in the Southern District of New York and elsewhere, CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to commit an offense against the United States, to wit, to violate Title 18, United States Code, Section 1960.

2. It was a part and object of the conspiracy that CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, and others known and unknown, did willfully and knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, the defendants agreed to transmit approximately $6 million dollars of money that they

believed to be stolen, using real estate companies and charities under their control, which failed to comply with the money transmitting business registration requirements set forth in federal law and regulations, in violation of Title 18, United States Code, Section 1960.

## Overt Acts

3. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

    a. On or about November 5, 2014, ALTER LANDAU, the defendant, met with a cooperating witness (the "CW") and told him, in sum and substance, that he would introduce the CW to JOSEPH NEUMAN, the defendant, and that NEUMAN would handle "drying and washing" the CW's money.

    b. On or about September 27, 2015, NEUMAN met with the CW at NEUMAN's residence in Monsey, New York. During this meeting, NEUMAN took $69,000 in cash from the CW, wrote a check in the same amount from a real estate business that he controlled, and made the check payable to a third party chosen by the CW.

    c. On or about October 29, 2015, CHASKEL LANDAU, the defendant, met with and took $6,900 in cash from the CW, which sum represented NEUMAN's agreed upon fee for transmitting the CW's money.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Operating an Unlicensed Money Transmitting Business)

4. From at least in or about September 2014, up to and including at least in or about August 2016, in the Southern District of New York and elsewhere, CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, and others known and unknown, did willfully and knowingly conduct, control, manage, supervise, direct, and own all and part of an unlicensed money transmitting business affecting interstate and foreign commerce, to wit, the defendants transmitted approximately $500,000 that they believed to be stolen, using real estate companies under NEUMAN's control, which failed to comply with the money transmitting business registration requirements set forth in federal law and regulations, in violation of Title 18, United

States Code, Section 1960.

(Title 18, United States Code, Sections 1960 and 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

5. I have been a Task Force Officer with the FBI Hudson Valley White Collar Crime Task Force since 2011. I have also been a police officer with the New York Police Department and Orange County Sheriff's Office, respectively, for approximately 12 years. During that time, I have participated in investigations of, among other things, money laundering, unlicensed money transmitting, mail fraud, wire fraud, and honest services fraud, in violation of Title 18, United States Code, Sections 1956, 1957, 1960, 1341, 1343, and 1346, respectively. During the course of these investigations, I have conducted or participated in wire and electronic surveillance, physical surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations. This affidavit is based on my communications with a cooperating witness, reviews of taped conversations, and my review of various reports and records. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the offenses cited above, it does not include all of the facts that I have learned during the course of the investigation. Where the contents of communications with others and statements by others are reported herein, they are reported in substance and in part, except where otherwise indicated.

6. Throughout this Affidavit, where I assert that a statement was made, I was not the individual to whom the statement was made unless I specifically so state. Rather, information about the statement was provided by the specified cooperating witness to whom I have spoken or whose reports I have read and reviewed. Such statements are among many statements made by others and they are set forth in substance and in part, unless otherwise indicated. Similarly, the information in this Affidavit resulting from surveillance, except where otherwise specifically indicated, does not set forth my personal observations, but rather was provided to me by other law-enforcement officers who observed the events described, and/or to whom I have spoken or whose reports I have read.

7. Furthermore, the facts and circumstances of this investigation have been summarized for the specific purposes of

3

this Application. I have not attempted to set forth the complete factual history of this investigation or all of its details. In making this Application, I rely only on the facts stated herein.

## Overview of the Land Development Plan and the Money Transmitting Scheme

8. From approximately in or about September 2014 to in or about August 2016, CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, engaged in a series of conversations and meetings with a confidential witness (the "CW"). Those conversations were consensually recorded at the direction, and under the supervision, of law enforcement. The purpose of the meetings and conversations was to induce the CW to invest in the development of a parcel of the land owned by CHASKEL LANDAU, the defendant, and his family (the "Landau Property" or the "Development Plan").[1]

9. In order to obtain the CW's investment of approximately $6 million in the Development Plan, CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, agreed to receive and transmit what they believed to be the CW's illegally obtained funds located domestically and overseas. The CW, among other things, told CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, how he had illegally obtained millions of dollars through his car-registration business. The CW further stated, in sum and substance, that his money was in cash, that he needed to move it into personal bank accounts, but that he could not deposit this money because "then the government knows how'd [sic] I get the money."

10. As described in greater detail below, CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, agreed to conceal the source of the CW's money by transmitting the CW's money to third parties, with the expectation that it would be returned to the CW, in return for a 10% "fee." The scheme was two-pronged. First, the defendants agreed to take cash from the CW, exchange the cash for checks written from real estate

---

[1] The CW was charged and has pled guilty in a separate investigation to tax evasion and mail fraud related to the CW's car-registration business. The CW has since been providing information and cooperating with law enforcement in the hope of receiving a more lenient sentence. The information he has provided has been credible and reliable.

4

companies controlled by NEUMAN, and make the checks payable to a third party bank account purported to be controlled by the CW. Second, the defendants agreed to use charitable organizations under their control to transmit the CW's overseas money into the United States. Over the course of the conspiracy, the defendants transmitted approximately $500,000 of what they believed to be stolen property, and agreed to transmit approximately $6 million total.

## The Money Transmitting Scheme

11. Based on my conversations with the CW, I know that in or about early 2014, the CW was introduced to an uncharged coconspirator ("CC-1") at a wedding they both attended in Monsey, New York. During the wedding, CC-1 told the CW that land was being purchased in Monroe and developed into residential units. The CW suggested to CC-1 that the CW was interested in investing.

12. Based on my conversations with other FBI agents and my review of law enforcement records, I know that in or around May 2014, while in the Budapest, Hungary airport, CHASKEL LANDAU and ALTER LANDAU, the defendants, approached the CW. CHASKEL LANDAU told the CW that he knew the CW had been dealing with CC-1. CHASKEL LANDAU said he wanted to speak to the CW regarding properties in Monroe.

13. Based on my discussions with the CW, my review of consensual recordings made by CW, and my review of consensual wiretaps of the CW's phone, I have learned, among other things, the following:

    a. On or about May 28, 2014, CHASKEL LANDAU and ALTER LANDAU, the defendants, met with the CW at the CW's office in Monsey, New York. The meeting was recorded. During the meeting, CHASKEL and ALTER LANDAU discussed the CW making a $6.25 million investment in the development of the Landau Property.

    b. On or about September 10, 2014, the CW met with CHASKEL LANDAU and ALTER LANDAU at the Landau Property in Monroe, New York. During this meeting, the CW stated, in sum and substance, that he had cash located overseas and wanted to bring it into the United States. CHASKEL LANDAU responded, "I have someone in Brazil. Whichever money I give him, he gives me a check to my congregation plus ten percent. No matter how much money."

5

c.  Approximately a month later, on or about November 5, 2014, the CW met with CHASKEL LANDAU and ALTER LANDAU at the CW's office in Monsey, New York. During the meeting, ALTER LANDAU asked, in sum and substance, how the CW acquired his money. The CW responded, "I got it not in a legal way," to which ALTER LANDAU replied, "You didn't pay taxes?" The CW responded, "Yes." ALTER LANDAU then stated the following:

> I know a Jew, a very wealthy man that can use part of it . . . . he is going to give you a check, and the check is going to be for us, and that's all. We are going to be pure. You're as if you are getting a loan from that person, but you are not going to have to pay the loan, as if you already paid him. He's going to give you a document as if you've already paid the loan.

ALTER continued, "His name is Yossel Neumann." ALTER then added, "He is going to need drying and washing. It is going to cost him. He is going to do this for us. He used to do it for us (UI). We'll sit down with him, we'll give him a hundred [thousand], he'll write it down, [and] he will give you a check for one hundred thousand. Based on my personal investigation of this matter, I believe that ALTER is explaining to the CW that JOSEPH NEUMAN, the defendant, would accept cash from the CW and write a check in return. I further know, based on my training and experience, that "drying" and "washing" are terms for concealing the source, nature, or control of illegal proceeds.

d.  Several months later, on or about June 1, 2015, the CW placed a call to CHASKEL LANDAU. The CW asked whether CHASKEL could set up an appointment with NEUMAN, to which CHASKEL replied, "He is a silent partner of ours, and if he says yes, it's yes, simple."

e.  Approximately two days later, on or about June 3, 2015, the CW met with CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN at NEUMAN's residence in Monsey, New York. Upon arriving, the CW asked the defendants to "close the door" because he had to explain to them the "whole story." The CW then stated, in sum and substance, that he had run a motor vehicle registration business and that he failed to pay taxes owed to the government. The CW added that he now needed to deposit his money into personal bank accounts without drawing scrutiny and asked for help. NEUMAN responded that he had made such an "accommodation" before. NEUMAN explained, in sum and substance, that he had a "partner" who "had a huge business" and was

6

building a house. NEUMAN's partner gave him "a hundred thousand dollars a month," and NEUMAN used the money to pay her business' bills. NEUMAN stated that the CW needed something like "that concept" because the CW's money "can't go into [his] account." NEUMAN added that he would charge the CW "ten percent" because "it's a job."[2] Based on my personal involvement in this investigation, I believe that NEUMAN is stating that he would keep 10% of any money he received from the CW as a fee.

        f.     Approximately a month later, on or about July 17, 2015, the CW met with CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, at NEUMAN's residence in Monsey, New York. The CW stated, in sum and substance, that he wanted to transmit a smaller quantity of money, approximately $15,000, to test the process before undertaking a larger transaction. NEUMAN told the CW to bring $15,000 cash and NEUMAN would provide the CW with a check written to whomever the CW wished. NEUMAN told the CW that the $15,000 was a favor, and that NEUMAN and CHASKEL LANDAU needed a decision soon regarding whether the CW would invest in the Landau Property. The CW then asked, "What's it going to cost me to cash this?" NEUMAN responded, "I want ten percent." The CW replied, "And you're gonna take care of the Landaus," to which NEUMAN responded, "I will make sure that they get money." NEUMAN added that "we have a relationship. They're not worried about it."

        g.     A few days later, on or about July 24, 2015, the CW met with CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, at NEUMAN's residence in Monsey, New York. I provided the CW with approximately $15,031 in cash prior to the meeting. The CW handed the cash to NEUMAN and requested that NEUMAN write a check to an entity called "Mainsail." NEUMAN returned a check for $15,031 ("Check-1") written from "Broadway Management LLC," and suggested that every Sunday the CW should deliver $1 million to him.

        h.     The same day, on or about July 24, 2015, myself and other law enforcement officers met the CW at a prearranged meeting location. We recovered Check-1 from the CW. Based on my review of account opening documents from Signature Bank, I know that Broadway Management LLC is a "real estate owner" whose

---

[2] During the same conversation, the CW further asked, "Chaskel, you makin' money also on this?" CHASKEL LANDAU did not respond, and the CW stated, "He's not answering me." NEUMAN replied, "I'm sure they will get something," to which the CW responded, "some from yours." NEUMAN stated, "Yeah."

7

major customers are "tenants" and "investors." NEUMAN is an authorized signor on the account.

  i. Several months later, on or about September 27, 2015, the CW met with JOSEPH NEUMAN and CHASKEL LANDAU at NEUMAN's residence in Monsey, New York. Prior to the meeting, I provided the CW with $69,000 in cash. The CW handed the cash to NEUMAN and requested that NEUMAN write a check to an entity called "Mainsail." NEUMAN returned a check for $69,000 ("Check-2") written from "Inter Global Reality LLC." NEUMAN afterwards discussed receiving an additional $6 million from the CW to invest in the Landau Property. NEUMAN explained, "The fact that you are getting it back from a legitimate real estate transaction, you have kosher money." The CW responded, "God forbid they ever check into it ya know," to which NEUMAN answered, "All three of us. God forbid they ever check into this, there's problems. Nothing is fool proof."

  j. The same day, on or about September 27, 2015, myself and other law enforcement officers met the CW at a prearranged meeting location. We recovered Check-2 from the CW. Based on my review of account opening documents from Signature Bank, I know that Inter Global Reality LLC is a "real estate owner" whose major customers are "Joseph Neuman" and "investors." NEUMAN is an authorized signor on the account.

  k. Approximately one month later, on October 23, 2015, NEUMAN spoke with CHASKEL LANDAU over the phone and told him to "go collect the $6,900." The same day, CHASKEL LANDAU called ALTER LANDAU and informed him of NEUMAN's request. Based on my investigation of this matter, I believe that this is the 10% fee for the above-described $69,000 cash-for-check transaction.

  l. Approximately six days later, on or about October 29, 2015, CHASKEL LANDAU met with the CW, during which the CW gave CHASKEL LANDAU $6,900 and told him "that's to give them the ten percent."[3] CHASKEL LANDAU then told the CW that CHASKEL can bring additional money into the country for the CW using ALTER LANDAU's congregation. CHASKEL LANDAU added, however, that the congregation cannot "take unlimited money because they don't wanna raise suspicion."

  m. Approximately four days later, on or about November 3, 2015, the CW met with JOSEPH NEUMAN and CHASKEL

---

[3] Prior to the meeting, I met with the CW and provided him with $6,900 in cash.

8

LANDAU at NEUMAN's residence in Monsey, New York. I provided the CW with $165,280 in cash prior to the meeting. The CW provided the cash to NEUMAN and CHASKEL LANDAU. NEUMAN wrote two checks to the CW ("Check-3" and "Check-4," respectively) to two entities of the CW's choosing: Mainsail and "M.E.P. Tech." The checks excluded $15,000, which the CW stated was NEUMAN's "ten percent." NEUMAN afterwards stated the CW has "gotta start movin'" and NEUMAN's "preference would be that we should walk in here one day . . . [with] two million dollars." CHASKEL LANDAU also advised the CW to "not talk on the phone and not to text anyone."

       n.     The same day, on or about November 3, 2015, myself and other law enforcement officers met the CW at a prearranged meeting location. We recovered Check-3 and Check-4 from the CW. Both were written from Inter Global Reality LLC.

       o.     Approximately a month and half later, on or about December 23, 2015, the CW met with CHASKEL LANDAU at CHASKEL LANDAU's residence in Spring Valley, New York. CHASKEL told the CW, in sum and substance, that ALTER LANDAU owed NEUMAN money and that NEUMAN was "desperate." CHASKEL further relayed to the CW a message from NEUMAN. According to CHASKEL, NEUMAN stated that "there's [sic] two way[s] of doing non-Kosher stuff. One way is we're doing small money." CHASKEL added, "It's small money you can do it through, we have so many charities that we involved, between all the charities." CHASKEL continued, "If you doing big money you have to work out the strategy with an attorney. You have to spend [and] you have to pay money to work out what is he doing and why is he doing it." That way, "if he's every questioned[,] he has . . . the backup to it."

       p.     One day later, on or about December 24, 2015, the CW met with JOSEPH NEUMAN and CHASKEL LANDAU at NEUMAN's residence in Monsey, New York. Prior to the meeting, I provided the CW with $247,500 in cash. The CW provided the cash to NEUMAN and CHASKEL LANDAU and asked NEUMAN to write two checks to Mainsail in the amounts of $100,000.00 and $125,000.00 ("Check-5" and "Check-6," respectively). The checks excluded $22,500, which represented NEUMAN's ten percent fee.

       q.     The same day, on or about December 24, 2015, myself and other law enforcement officers met the CW in a prearranged meeting location. We recovered Check-5 and Check-6 from the CW. Both were written from Inter Global Reality LLC.

  14.    Based on my review of publicly available databases maintained by the Financial Crimes Enforcement Network

("FinCEN"), I know that CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, lack state licenses to engage in the business of receiving money for transmission or transmitting the same. I further know that Broadway Management LLC and Inter Global Reality LLC also lack state licenses to engage in the business of receiving money for transmission or transmitting the same.

WHEREFORE, your deponent respectfully requests that warrants be issued for the arrests of CHASKEL LANDAU, ALTER LANDAU, and JOSEPH NEUMAN, the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

MEREDITH McGOVERN
Task Force Officer
Federal Bureau of Investigation

Sworn to before me this
11th day of November 2019

THE HONORABLE PAUL E. DAVISON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK